DECISION AND JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Matthew LaFrance, appeals the February 11, 2004 judgment of the Wood County Court of Common Pleas which, following a jury trial convicting him of burglary, sentenced appellant to three years of community control. For the reasons that follow, we reverse appellant's conviction and remand the matter for a new trial.
 {¶ 2} The relevant facts of this case are as follows. On March 20, 2003, appellant was indicted on one count of burglary, in violation of R.C. 2911.12(A)(4). The charge stemmed from an incident at Bowling Green State University, in Wood County, Ohio, where appellant was caught in a resident's hall dormitory room, somewhere he had not been invited, with his hand in a dresser drawer. On April 7, 2003, appellant entered a not guilty plea.
 {¶ 3} Prior to his arrest and while appellant was being detained by campus police, an officer seized approximately four pairs of women's undergarments from appellant's coat pocket. On April 24, 2003, appellant filed a motion to suppress this evidence arguing that the seizure did not fall within any of the enumerated exceptions to the warrant requirement. On May 16, 2003, appellant amended the motion to include any statements obtained in violation of his constitutional rights. On May 23, 2003, a hearing was held on the motion, and the motion was denied on May 28, 2005.
 {¶ 4} The jury trial commenced on December 9, 2003, and the following evidence was presented. Brittany Gilliam testified that on February 8, 2003, she lived in the McDonald East residence hall, in room 428, on the campus of Bowling Green State University. In the early morning of February 8, Gilliam, her roommate, Patrice Perry, Martice Murff, Sherice Simpson, and Rafael Jackson, were playing blind man's bluff in the lounge adjacent to Gilliam's room (the lounge separated the male and female wings of the floor), when they noticed appellant walking through the lounge from the male to the female side; he walked past Gilliam's room and out of their sight. Gilliam testified that they noticed appellant because he was smoking a cigarette and smoking was not permitted in the residence halls.
 {¶ 5} Gilliam testified that shortly thereafter, one of her friends said that someone was going into her room. Gilliam testified that she went around the corner and entered her room where she observed appellant going through her top dresser drawer which contained toiletries, jewelry, and important papers. Gilliam stated that the lights in her room were turned off and they had left the door open "more than a crack."
 {¶ 6} Gilliam stated that she confronted appellant by asking him: "What are you doing in here?" According to Gilliam, appellant indicated that he was looking for his friends and that he was looking for cigarettes in the top drawer. Appellant stated that he believed that he was in his friend's room.
 {¶ 7} Gilliam's roommate called campus police and prevented appellant from leaving the room. While they were waiting for the police to arrive, Gilliam and her friends decided to release appellant because he was intoxicated and confused. Gilliam testified that they believed that appellant really thought he was in his friend's room. After they allowed him to leave, appellant was walking down the hall when the officers confronted him; the officers took him back to the lounge and pulled out several pairs of women's undergarments from his pockets. Gilliam testified that neither she nor her roommate could identify them. Gilliam also testified that nothing was missing out of her top dresser drawer or out of her room.
 {¶ 8} During cross-examination, Gilliam stated that while her roommate was blocking appellant from exiting their room he did not get agitated or attempt to leave; appellant just tried to explain what he was doing in the room. Appellant consistently maintained that he thought he was in his friend's room and that he was looking for cigarettes.
 {¶ 9} Gilliam's roommate, Patrice Perry, testified next. She stated that when Gilliam entered the room to confront appellant, Gilliam turned on the lights and began "hollering" at him. Perry testified that appellant stated that he thought he was in his friend Gilliam's room because "Gilliam" was on the door. Appellant told them that he was not a student and that he was visiting friends there.
 {¶ 10} Perry testified that she called the police and that she was upset and "really hollering" at appellant. Appellant maintained his story that he was looking for cigarettes; Perry believed him because he was drunk and "hopeless."
 {¶ 11} Perry testified that once appellant was arrested, she and her friends were scared that he was going to come back. Perry explained that they were scared because appellant was "probably upset" because they called the police.
 {¶ 12} When Perry was cross-examined, she testified that when they were holding appellant in their room, they were yelling at him but appellant was not yelling. Perry stated that appellant told them to call the police and he gave them his name. Perry also remembers him saying that he was looking for cigarettes in "Gilliam's room." Perry stated that she hung up with 9-1-1 because her friends believed appellant's story.
 {¶ 13} The last eyewitness, Martice Murff, testified that she believed appellant's story at first. Murff testified that the more appellant talked, the less convincing he became. Murff indicated that part of the reason she did not believe appellant was that he said he was looking for "Gilliam," she felt that he just took the name off the door. Murff also did not believe that appellant was looking for cigarettes because he was smoking one when she first saw him.
 {¶ 14} Bowling Green State University Patrol Officers Shelly Mack and Larry Bateson testified. Officer Mack responded to room 428 and, after calming the individuals down, got some information. Officer Bateson testified that he encountered appellant in the hallway and began talking to him.
 {¶ 15} Officer Bateson testified that he read appellant his Miranda
rights. Bateson stated that appellant was neither cooperative nor uncooperative; appellant was intoxicated and would not answer questions. Bateson observed a bulge in appellant's right coat pocket. Bateson testified that the flap that covers the pocket was tucked inside and that he could see that women's undergarments were inside. Officer Bateson testified that he asked appellant where he got the undergarments and that appellant stated that "young ladies gave him a kiss and gave [him] their panties." Appellant denied that the girls took the undergarments off and gave them to him; he denied that they took them out of the laundry or out of a dresser drawer. Despite going through the entire residence hall and making an inquiry at the Bowling Green Police Department, campus police were never able to identify the ownership of the undergarments.
 {¶ 16} Officer Bateson testified that appellant told him he was looking for his friend, Dave Gilliam. Officer Bateson located Dave Gilliam, but Gilliam denied knowing appellant. According to Bateson, Gilliam told him that he lived in room 328, which would be directly below Brittney Gilliam's room.
 {¶ 17} David Gilliam was the state's final witness. Gilliam testified that he lived in room 325 in February 2003, not room 328. Gilliam testified that maybe the officer got the number from his friend, Donnie, who appellant drove up with to visit Gilliam. Gilliam testified that on the Monday or Tuesday prior to the incident, he spoke with Donnie who indicated that he and appellant were coming up on Friday or Saturday. Donnie and appellant arrived at approximately 8:00 or 9:00 p.m. on Saturday. Gilliam, Donnie, and several other individuals went to a party off-campus. Appellant stayed at the residence hall with Gilliam's roommate. The two called Gilliam and indicated that they wanted to go to the party; Gilliam went back to the dorm to get them. By the time he got back, Gilliam was informed that appellant was in the fourth floor lounge.
 {¶ 18} Gilliam testified that he went up to the lounge to see what was happening. The police officer took his identification and stated that he would not return it until Gilliam went down and got Donnie. When Officer Bateson asked Gilliam if he knew appellant, Gilliam responded negatively. Gilliam testified that he lied to Bateson because he did not want to get in trouble for underage drinking; he had been caught with alcohol in his dorm room on a prior occasion.
 {¶ 19} At the conclusion of the state's case, appellant moved for a judgment of acquittal under Crim. R. 29, contending that the state failed to present any evidence of stealth used to gain entry into Gilliam's and Perry's dorm room. The motion was denied. On the second day of trial, appellant, who had planned to testify, had car problems and was unable to appear. During an in-chambers telephone conversation, appellant agreed to have the trial proceed without him and his testimony. Thereafter, the jury returned a guilty verdict. This appeal followed.
 {¶ 20} Appellant now raises the following three assignments of error for our consideration:
 {¶ 21} "Assignment of Error Number One: The verdict was unsupported by and against the manifest weight of the evidence.
 {¶ 22} "Assignment of Error Number Two: The trial court erred in denying appellant's motion to suppress the seizure of women's undergarments and appellant's statements."
 {¶ 23} "Assignment of Error Number Three: The prosecutor made inappropriate statements regarding appellant's failure to testify and present evidence such that a new trial should be granted."
 {¶ 24} In his first assignment of error, appellant maintains that his conviction for burglary was against the manifest weight of the evidence. In determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "`* * * weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997), 78 Ohio St.3d 380,387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 25} In this assignment of error, appellant argues that the weight of the evidence fails to establish that appellant trespassed, by means of force, stealth, or deception, in a permanent or temporary habitation of any person. R.C. 2911.12(A)(4). "Stealth" has been defined as "`any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission.'"State v. Ward (1993), 85 Ohio App.3d 537, 540, quoting State v. Lane
(1976), 50 Ohio App.2d 41, 47.
 {¶ 26} After careful review of the proceedings and, particularly, the trial transcript, we must conclude that the jury lost its way and created a manifest miscarriage of justice in finding appellant guilty of burglary. As set forth above, the jury is charged with the responsibility of resolving conflicts in the evidence. Here, this court, sitting as the "thirteenth juror" can find no conflicts in the evidence. The three eyewitnesses presented by the state universally testified that appellant's explanation of why he was in the dorm room remained consistent, that they believed him, and that he was intoxicated and confused. His story was bolstered by the fact that he was an invited guest of another "Gilliam" who resided one floor below. The door to the room he entered was unlocked and open wider than a crack. Further, although it was between midnight and 1:00 a.m. when he entered the dorm room, it was a Saturday night on a college campus and appellant had just walked past several students in the adjacent lounge. Additionally, once appellant was discovered he did not try to leave the room or become argumentative. In fact, appellant encouraged the resident's to call 9-1-1 and gave them his name. Finally, while we acknowledge that theft is not an element of burglary under R.C. 2911.12(A)(4), the fact remains that the undergarments found in appellant's coat pocket were never identified by anyone in the resident's hall. This fact discredits the state's argument that appellant, desiring to commit a theft offense, entered the room by "force, stealth, or deception." Based on all of these facts, we find that appellant's first assignment of error is well-taken.
 {¶ 27} In appellant's second assignment of error, he contends that the court erroneously denied his motion to suppress the seizure of the women's undergarments and the statements he made to Officer Bateson.
 {¶ 28} Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. State v. Davis (1999),133 Ohio App.3d 114, 117. Since a trial court deciding the motion to suppress acts as a factfinder, an appellate court must accept the trial court's findings of fact as true if supported by competent, credible evidence. State v. Kobi (1997), 122 Ohio App.3d 160, 167-168, discretionary appeal not allowed (1997), 80 Ohio St. 3d 1466. However, an appellate court reviews de novo the trial court's application of the law to the facts. Id.
 {¶ 29} Appellant argues that the undergarments that Officer Bateson recovered from his coat pocket were not properly seized under the plain view exception. The Ohio Supreme Court has held that, in order for the plain view exception to apply, the state must show that: "(1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities." State v. Williams (1978), 55 Ohio St.2d 82, paragraph one of the syllabus. Williams was modified by State v. Halczyszak (1986),25 Ohio St.3d 301, 305, wherein, the Ohio Supreme Court explained the third requirement for the "plain view" exception to the warrant requirement. The court stated that the incriminating nature of the evidence "may arise from the character of the property itself or, * * *, from the circumstances in which the property is discovered. Further, in determining whether such evidence is contraband the court held that, "police officers may rely on their specialized knowledge, training and experience; * * *." Id. at paragraph four of the syllabus.
 {¶ 30} Following the Williams model, we first note that Officer Bateson's initial detention of appellant was lawful as he met the description of the individual that intruded into a dormitory room without permission. Appellant was also identified as the intruder. Next, Bateson testified at the suppression hearing that while talking with appellant, he noticed that his right coat pocket was bulging. There was no flap covering the pocket and Bateson stated that he was able to look down and see what he believed to be a "blue and white panty." He pulled the undergarment out and proceeded to pull out the next pair. Finally is the question of whether the incriminating nature of the undergarments was apparent. Appellant had just been caught rifling through the top dresser drawer of a female dormitory room. The fact that the owner or owners of the undergarments were never identified does not negate Bateson's initial suspicion that appellant had taken them from the dormitory room. Further, Bateson testified that he was aware that in the city of Bowling Green there had been a problem with break-ins into residences and the theft of similar items. Based on the foregoing, we conclude that the seizure of the undergarments was appropriate.
 {¶ 31} Appellant also disputes the trial court's denial of his motion to suppress the statements he made to Officer Bateson. Appellant contends that because he was intoxicated and he did not acknowledge that he heard or understood his rights under Miranda v. Arizona (1966), 384 U.S. 436, he did not knowingly, intelligently, and voluntarily waive his rights.
 {¶ 32} A suspect may waive his Miranda rights provided his waiver is knowing and voluntary. Edwards v. Arizona (1981), 451 U.S. 477, 483. The issue of waiver is determined by a totality of the circumstances in each case, including the defendant's background, experience, and conduct. Id. A Miranda waiver need not be expressly made in order to be valid. NorthCarolina v. Butler (1979), 441 U.S. 369. The state is required to prove, by a preponderance of the evidence, that the defendant waived his right to remain silent. Colorado v. Connelly (1986), 479 U.S. 157.
 {¶ 33} Looking at the totality of the circumstances in this case, we find that appellant knowingly, intelligently, and voluntarily waived his rights. Officer Bateson testified that appellant gave him his driver's license when asked and admitted that he had been drinking. Bateson read appellant his Miranda rights off a card he kept with him. Bateson testified that appellant did not verbally acknowledge that he understood and wished to waive his rights; however, appellant continued with his explanation as to why he went into the dormitory room.
 {¶ 34} Based on the foregoing, we find that the trial court did not err when it denied appellant's motion to suppress. Appellant's second assignment of error is not well-taken.
 {¶ 35} Although we have determined that appellant is entitled to a new trial based upon our ruling on his first assignment of error, we feel compelled to address the prosecutorial misconduct claim raised in his third assignment of error. In this assignment of error, appellant contends that the prosecuting attorney, during his closing argument, repeatedly made improper references to appellant's failure to testify. Specifically, appellant contends that the following comments made by the prosecutor were improper:
 {¶ 36} "[N]ow this is kind of an admittedly tricky situation, I've got to be careful what I say, and you have to be careful what you consider. As the judge told you the defendant has an absolute constitutional right not to testify. You should not hold that against him. In fact, I'll even say that any one of us could be charged with a crime and we would want that same constitutional right. And it doesn't do any good to have that right if the jury's just going to turn around and infer guilt because you deserve that right. So don't do that.
 {¶ 37} "But now having said that, I also don't want you to fall victim to the power of suggestion, and by that I mean the judge has already told you a number of times that what we say the attorneys in opening statement and closing argument is not evidence. So while the defendant has an absolute right not to testify, and you should draw any inference from that whatsoever. By the same token you recall certain things that Mr. Hart said in opening statement that are not evidence and that never came out in evidence, and you must decide this case based on the evidence you hear in this courtroom. Now I'm not looking to take advantage of the fact that the defendant didn't put on any evidence. That's his right."
 {¶ 38} At this point, defense counsel asked to approach the bench and he objected to the prosecutor's comments regarding appellant's decision not to testify. The court admonished the prosecutor and warned him to refrain from making any further comments about appellant not testifying. The court noted that it had "already covered that in [its] instruction, * * *." A curative instruction was not given.
 {¶ 39} The prosecutor then stated that defense counsel "is right to be concerned with that objection because again, you should not infer anything from his decision not to testify."
 {¶ 40} While the state is entitled to some latitude in its closing argument, State v. Bies (1996), 74 Ohio St.3d 320, 326, prosecutorial misconduct during closing argument rises to the level of reversible error where the statements made were improper and they affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160, 166. In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether, absent the improper remarks, the jury would have found the appellant guilty beyond a reasonable doubt. State v.Maurer (1984), 15 Ohio St.3d 239, 267.
 {¶ 41} It is well-established that it is improper for a prosecutor to comment on the defendant's failure to testify. Griffen v. California
(1965), 380 U.S. 609; State v. Fears (1999), 86 Ohio St.3d 329, 336. It follows that the comments made in this case improperly reference appellant's failure to testify. The state contends that the references were not harmful; they acted to underscore appellant's constitutional right not to testify. We find the state's contention specious, at best. Rather, we believe that the prosecutor's comments were purposely made to emphasize the fact that appellant did not testify. Moreover, these comments were made knowing that appellant was not present. We further find, as discussed in our analysis of appellant's first assignment of error, that the evidence in this case was scant, at best; thus, we conclude that the prosecutor's comments prejudiced appellant and constitute reversible error. Appellant's third assignment of error is well-taken.
 {¶ 42} On consideration whereof, we find that appellant was prejudiced and prevented from having a fair trial and the judgment of the Wood County Court of Common Pleas is reversed. The matter is remanded for a new trial. Appellee is ordered to pay the costs of this appeal for which sum judgment is rendered against appellee on behalf of Wood County and for which execution is awarded. See App. R. 24.
Judgment reversed.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Parish, J., Concur.